BODARY *v.* McNUTT.

CONTRACTS—BUILDING CONSTRUCTION—COST PLUS—FIXED PRICE.
   Trial court's finding for defendant home owner in building con-
      tractor's nonjury action for balance claimed to be due under
      alleged cost-plus contract for construction of home is not
      disturbed as being contrary to the clear preponderance of the
      evidence, defendant having claimed the construction was to
      be done for a fixed price.

Appeal from Wayne; Brennan (John V.), J.
Submitted April 2, 1957. (Docket No. 4, Calendar
No. 46,631.) Decided September 4, 1957.

Assumpsit by Andrew Bodary against Thomas
McNutt and Edna McNutt for sums claimed due on
oral building contract. Defendants seek recoup-
ment. Judgment for defendants. Plaintiff appeals.
Affirmed.

*Arthur C. Lumley,* for plaintiff.

*Fred A. Lehmann,* for defendants.

SMITH, J. "This case is an instance of what is get-
ting to be chronic litigation between home owner and
contractor. The one invariably claims that the con-
tractor agreed to build a house on his lot for so

---

REFERENCES FOR POINTS IN HEADNOTES
9 Am Jur, Building and Construction Contracts § 20.
Construction of "cost-plus" contracts. 2 ALR 126; 27 ALR 48.
Measure and items of compensation of contractor under cost-plus
   contract which is terminated, without breach, before completion.
   28 ALR2d 867.

much money, whereas the other usually insists that the agreed arrangement was that of 'cost-plus' construction. The parties in cases of such nature rarely reduce their commitments to writing. When they do, apparently inevitable controversies respecting extras and subsequent modifications—occasioned by claimed oral agreement from time to time as work progresses—make up a congeries of trouble for our trial courts." *Barnes* v. *Beck,* 348 Mich 286, 287.

Such is again our issue here. The plaintiff built a house for the defendants. In the words of the circuit judge:

"What was the contract between the parties litigant?

"The issue is not without difficulties. This, by reason of there being no written contract between the parties. The plans and specifications, while of importance and in writing, are nevertheless not a contract. The contract of building rests entirely in parol. It may be stated in this connection, by fair inference, that every such oral contract is an open invitation to misunderstanding and disagreement.

"The plaintiff contends the contract was a cost-plus contract, and sues on that basis. The defendants contend that the contract was for an agreed definite sum, namely, $15,000, for the complete job for house and garage."

The record does not disclose why there was no writing. "Defendants claim," held the circuit judge, "and so testified that they asked plaintiff for a contract in writing and that plaintiff refused to give them such. Plaintiff's testimony on this point corroborates that of defendants, his reasons therefor not being particularly illuminative or impressive."

The plaintiff has been paid $14,866.09. He seeks in this action the further sum of $10,782.85, the balance allegedly due under the cost-plus arrangement. Defendants, in addition to denying the validity of

the plaintiff's additional claim, sought in recoupment the sum of $3,513.69 for items allegedly included in the plans and specifications (but furnished and paid for by the defendants), for items never furnished by the plaintiff, as required by the plans and specifications, and for changes in construction which the plaintiff made to effectuate savings in an unknown amount.

The trial court held that the contract finally negotiated between the parties was for a flat sum of $15,000 for the house and garage. Expenses for certain deviations (a garage door replaced by the defendants, a stone front on the house, and certain fixtures the cost of which exceeded that set forth in the specifications) were added by the court to this sum, bringing the total to $15,891.25. Of the amount claimed in recoupment, the plaintiff admitted $845.77 and the court allowed an additional $364.50 for linoleum and fill dirt supplied by the defendants at their own expense. Thus, adding the extras to the contract price, and deducting the payments made to plaintiff and the recoupment, a net credit in the defendants' favor of $185.11 was found. Thereupon judgment of no cause of action was entered against the plaintiff and in favor of the defendants for this amount. From a denial of the motion to set aside the judgment and for a new trial the plaintiff takes a general appeal.

The defendants were at the retirement stage of life. Mr. McNutt had stopped work in 1947. Just prior to seeking out the plaintiff to build this house, the defendants' farm had been taken by condemnation for the Wayne County airport. In the spring of 1947 the defendants visited the plaintiff with "ideas out of some books" for a home. Without a set of definite plans the plaintiff refused to discuss costs with the defendants. He suggested an architect in Monroe, whom defendants consulted. The

parties met several more times before they had the final plans from the architect. Plaintiff then testified as to the formation of the contract:

"I looked them over and told them it was impossible to build the home that was represented by exhibit 1 for any $16,000. Mrs. McNutt said that they asked the architect to draw plans for $16,000 and how come? I said, I couldn't tell, but I knew it couldn't be built for anywheres near that. They said that's what they wanted to pay. And I said, 'Well, if that's the case, you might just as well stop right here. The only way that I can possibly take the job would be a cost plus 10% on the minimum of $16,-000. Any cost above that would be paid by Mr. and Mrs. McNutt.' They said they have to think it over.

"I believe there was another meeting. That meeting took place in just a day or so. At this next meeting I believe I went to their home. Mr. and Mrs. McNutt were both present. At the next meeting Mr. and Mrs. McNutt said they would consider the bedroom and garage be deleted from the plans and specifications. When they made known that fact to me, as far as I was concerned, it didn't make any difference, but I pointed out the fact they intended to put it on later it was going to cost them more money again and seeing that they wouldn't have to pay on only a minimum of $16,000 at 10%, I thought they would be ahead to go ahead with it, and they agreed to it. They merely said, go ahead and start the job; on the basis of 10% I started the job."

The defendants' version of the negotiation of the contract differs:

"After we told Mr. Bodary that 15,000 was all we could spend, Mr. Bodary said he would build the house for 15,000 but not the garage. He would build the house without the garage. At that time I just decided to build the house, not the garage."

With .reference to later garage developments:

"We got the idea about a garage when Mr. Bodary asked us if we wanted a garage built, and we asked if we had enough saved, and he said he thought we had, out of the 15,000. Our agreement with Mr. Bodary made at a later date was that he would build a garage from savings effected in the changes of construction."

The house to be constructed was to have 3 bedrooms, bath and lavatory, utility room, living room, kitchen and breakfast nook, solarium, a hall leading to the garage, recreation room in the basement, and a fireplace in both the recreation room and the living room. Under the circumstances thus presented, construction was begun about July 1, 1947, and completed in late February or early March, 1948, at which time the defendants took possession. Some variation from the plans and specifications occurred during actual construction. Asbestos shingles were replaced with asphalt; fancy trim and fan-shaped window were eliminated from the exterior of the attic; plywood was substituted for oak flooring; plaster in place of plastic tile was used in the kitchen and lavatory; wooden casements were used in place of thermopane; and field stone, in place of brick, was placed around the picture window.

Mrs. McNutt testified that throughout the period of construction none of the bids received by plaintiff from subcontractors for various phases of the work, *e.g.,* heating, electrical, plumbing, et cetera, were submitted to the defendants for approval.

It is true, as plaintiff contends, that the defendants selected many of the electrical and plumbing fixtures and certain finishing material, *viz.,* linoleum. Some, it seems, cost more than was set forth in the specifications. Much of the difficulty here was caused by the fact that the parties were building

in a post-war boom period when materials were not
readily available. In addition to this, the catalog
numbers in the specifications were no longer cur-
rent; therefore, new items had to be chosen. Some
of the items the defendants chose because the plain-
tiff himself failed and neglected to provide them as
required by the plans and specifications. These he
admitted in defendants' recoupment. One major
item which the defendants were forced to provide
and pay for themselves was the fill dirt for the grad-
ing of the area around the house which the plaintiff
refused to do although the trial judge found that
the "specifications provided for rough grading."

The payments made to the plaintiff by the defend-
ants are also a source from which they draw con-
flicting inferences. It is undisputed that the plain-
tiff was paid the sum of $14,866.09. The last amount
of this was paid in 1948. Mrs. McNutt related the
transaction:

"*Q.* And when you gave him the final check on
March 5, 1948, of $3,000, did he show you anything
then?
"*A.* No, sir.
"*Q.* Did he ask for anything?
"*A.* He asked for $3,000. I said, 'You don't mean
to tell me that's getting that close?' He said, 'Yes,
pretty near.'
"*Q.* What do you mean by 'that close'?
"*A.* I meant pretty near to that $15,000.
"*Q.* You mean it was close to $15,000?
"*A.* Yes, sir.
"*Q.* And what did he say?
"*A.* He said, 'Pretty—getting pretty near.'
"*Q.* 'Pretty near?'
"*A.* Yes."

Yet the plaintiff made no further demand for
funds due him from the defendants until December,
1949. He testified that he "wanted to give them

plenty of time, after I knew they owed me 10 or 11 thousand dollars." On the other hand, the defendants themselves made no demand upon the plaintiff for any compensation for work and materials they were required to furnish and pay for as a result of the failure of the plaintiff to perform in certain particulars. Mrs. McNutt explained their failure to seek reimbursement from the plaintiff as follows:

"*A.* Because when we went to him, he told us he was all done and through. We figured we wouldn't do it, and rather than to get Mr. McNutt into trouble, we didn't do it. We didn't ask him.

"*Q.* But you made no demand whatsoever?

"*A.* No, rather not get in trouble and have Mr. McNutt sick, wouldn't do it."

(Mr. McNutt died following the trial and during the course of this appeal.)

What was the type of contract entered into by the parties? The facts presented by each side at the trial were diametrically opposed and the facts argued on appeal are no closer to agreement. The plaintiff testified that the contract could only have been "cost plus." In support of this he offers the testimony of the plumber subcontractor to the effect that Mrs. McNutt "told me when she was picking out the fixtures that it was a cost-plus job, cost-plus material." Mrs. McNutt, on the other hand, testified that she "never mentioned such a thing to him." In fact, it appeared from her testimony that she had little conception of the meaning of the term "cost plus" as it is used in the building trades. With respect to the disputed issues of fact the trial court held as follows:

"One of the sharply disputed areas disclosed by the record pertains to the matter of savings on the house by way of substitution of materials, et cetera, in order that a garage might be built within the

aforementioned $15,000 overall price. Viewed in the light of the background of the testimony of the respective claims of the parties litigant as to what was the contract between them, this testimony is consonant only, in reason and by fair inference, with an overall definite sum for the construction of the house and the garage. The record is devoid of any reason, in fact or otherwise, for such savings in the construction of the house except in connection with the purpose of such savings, namely, the building of a garage. Nor by fair inference, is such discussion about savings, or of savings in fact, consonant with a cost-plus contract."

"The testimony relative to consultation with and submission to defendants of invoices, cost sheets, subcontractors prices and contracts, by plaintiff, except in a few instances, is to the effect that he did not deem such necessary under the terms of his claimed contract.

"The further fact that in the various payments by defendants to plaintiff in the aggregate sum of $14,-866.09, the last payment of which, in the sum of $3,000 was made on March 5, 1948, at which time defendants were in possession of the house, no mention seems to have been made of a sum approximately $10,000 yet owing, is not consonant with reason or common sense. Nor by fair inference, from the record, is such compatible with the cost-plus type of contract which plaintiff contends he had with the defendants. * * *

"Coming back to the issue in the case at bar, namely, what was the contract between the parties, the court is of opinion that viewing all of the testimony pertinent to this issue as such testimony sounds in the record, the plaintiff has not met the required burden of proof. The court therefore is of opinion and so finds, that the contract between the parties was for the fixed sum of $15,000, this sum to include the house and garage as now constructed, with certain deviations therefrom by reason of what might be termed extras, as well as of items left incomplete

or undone. In this field of extras, so-called, are 2 items of consequence, namely, the cobblestone front and the matter of grading of the premises."

(With respect to these latter 2 items the court took additional testimony and incorporated adjustments with respect thereto in his decree.)

The plaintiff urges in the review of this case that the findings of the court below are against the great weight of the evidence and therefore a gross miscarriage of justice. We have carefully reviewed this voluminous record, realizing full well the burden of the trial court. Controlling issues of fact were sharply contested. The circuit court, careful in its findings, assayed the credibility of the witnesses who appeared before it and weighed their testimony. We are constantly aware that a trial court has the opportunity to observe the witnesses, their demeanor, and to weigh the other intangibles not available to us on the printed page. The opinion of my Brother BLACK in *Barnes* v. *Beck, supra,* might well be read with profit at this point, particularly that portion dealing with our function in nonjury cases and the more advantageous position (for determination of facts) of the trial judge. In the case before us we are not persuaded, as appellant asserts, that the judgment of the trial court was "against the great weight of the evidence," or that the evidence clearly preponderates in the direction opposite to his findings and conclusions. See *Jones* v. *Eastern Michigan Motorbuses,* 287 Mich 619.

Other questions raised by appellant are not meritorious and are not, therefore, discussed. The judgment of the circuit court is affirmed. Costs to appellees.

SHARPE, EDWARDS, VOELKER, KELLY, CARR, and BLACK, JJ., concurred with SMITH, J.

DETHMERS, C. J., concurred in the result.